941 F.2d 1563
 60 USLW 2219, 69 Ed. Law Rep. 689
 JSK, a minor, By and Through his next friends, JK and PGK,
and JK and PGK, Individually, Plaintiffs-Appellants,
v.
HENDRY COUNTY SCHOOL BOARD and William Burke,
Superintendent, Hendry County School Board, in his
official capacity, Defendants-Appellees.
 No. 90-5793.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 20, 1991.
 
 Alice K. Nelson, Jodi Siegel, Southern Legal Counsel, Inc., Gainesville, Fla., for plaintiffs-appellants.
 Gavin W. O'Brien, Bradenton, Fla., Phillip D. Parrish, Robert M. Klein, Stephens, Lynn, Klein & McNicholas, Miami, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before FAY and EDMONDSON, Circuit Judges, and GARZA*, Senior Circuit Judge.
 EDMONDSON, Circuit Judge:
 
 
 1
 In this case that was brought under the Education for All Handicapped Children Act (EAHCA), the parents of an autistic child appeal the district court's dismissal of their claim that a 1985 Individualized Education Program (IEP) prepared for their son by Florida's Hendry County School Board was inappropriate, and the district court's decision that a 1986 IEP satisfied EAHCA requirements. We VACATE the district court's judgment regarding the 1985 IEP and REMAND the 1985 IEP claim for further review, and we AFFIRM the district court's judgment on the 1986 IEP.
 
 I. BACKGROUND
 
 2
 J.S.K., through his parents, J.K. and P.G.K., brought this suit against the Hendry County School Board (Board) under the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. §§ 1400-1485. EAHCA guarantees that handicapped children will receive a "free appropriate public education," 20 U.S.C. § 1412(1), that is "tailored to the unique needs of the handicapped child by means of an 'individualized education plan' (IEP)." Hendrick Hudson Cent. School Dist. v. Rowley, 458 U.S. 176, 181, 102 S.Ct. 3034, 3038, 73 L.Ed.2d 690 (1982) (citing 20 U.S.C. § 1401(a). The IEP is
 
 
 3
 a written statement for each handicapped child developed in any meeting by a representative of the local education agency or an intermediate educational unit ..., the teacher, the parents ..., and, whenever appropriate, such child, which statement shall include--
 
 
 4
 (A) a statement of the present levels of educational performance of such child,
 
 
 5
 (B) a statement of annual goals, including short-term instructional objectives,
 
 
 6
 (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,
 
 
 7
 . . . . .
 
 
 8
 (E) the projected date for initiation and anticipated duration of such services, and
 
 
 9
 (F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
 
 
 10
 20 U.S.C. § 1401(a)(20).
 
 
 11
 EAHCA also provides important procedural rights. See, e.g., Doe v. Alabama State Dep't of Educ., 915 F.2d 651, 654 (11th Cir.1990). These procedural safeguards to the identification, evaluation and educational placement of the child include: access to all relevant records, 20 U.S.C. § 1415(b)(1)(A); the right to receive written notice of proposed changes in the IEP, id. § 1415(b)(1)(C); the opportunity to present complaints concerning any matter, id. § 1415(b)(1)(E); the right to an impartial due process hearing before the local and state educational agencies, id. § 1415(b)(2) & (c); and the right to bring a civil action either in a state court of competent jurisdiction or in a federal district court, id. § 1415(e)(2). J.S.K.'s parents brought this civil action after being dissatisfied with J.S.K.'s 1985 and 1986 IEPs and after failing to find relief in the state courts and administrative proceedings.
 
 
 12
 J.S.K., an autistic child who is now fifteen years old, was born in 1976. By his third birthday, J.S.K. had been diagnosed as mentally retarded, and by age five he showed a variety of behavioral problems, including a short attention span, repetitive speech patterns and difficulty establishing and maintaining eye contact. Between the ages of five and ten, J.S.K.'s aggressive and maladaptive behavior at home and in school increased dramatically; he cursed, destroyed property, bit, pulled hair and struck others. J.S.K. also engaged in self-injurious behavior, including head-banging and window-smashing. His relationship with his family was immature and his relationships with peers were nearly nonexistent. Apart from maladaptive and self-injurious behavior, J.S.K. also showed typical autistic behavior, including hand-flapping, toe-walking, rocking, staring at lights, reacting extremely to changes in routine and fixating on fingers and machines.
 
 
 13
 J.S.K. entered the Hendry County School System in 1981, when he was placed in the Clewiston Primary kindergarten class for trainable mentally handicapped children (TMH). His parents found this program inappropriate and unilaterally removed J.S.K. from Clewiston Primary, placing him in a private school for the remainder of the 1981-82 school year. J.S.K., however, returned in 1982 to Clewiston Primary, where he was placed in a first grade TMH class for the 1982-83 school year.
 
 
 14
 J.S.K.'s first IEP, which was written in 1983, continued his TMH classification for the 1983-84 school year. The IEP for the 1984-85 school year recommended continued placement at Clewiston Primary and placed J.S.K. in a resource room for children with emotional handicaps. During these years, J.S.K. received speech therapy.
 
 
 15
 The Florida Department of Health and Rehabilitative Services (HRS) evaluated J.S.K. in 1985 for the purpose of determining eligibility for noneducational developmental services. The HRS issued J.S.K.'s habilitation plan, which recommended an away-from-home residential facility and a behavior management plan to control his destructive and self-injurious behavior.
 
 The 1985 IEP
 
 16
 J.S.K.'s IEP for the 1985-86 school year was written in 1985. This 1985 IEP placed J.S.K. in a school in LaBelle, which is approximately thirty-five miles from his home in Clewiston, and offered the following services: a profoundly handicapped class and program; speech class for severely emotionally disturbed (SED) students; SED class placement in a varying exceptionalities (VE) class; special transportation with an aide; an additional classroom aide to maximize instruction and to provide one-on-one supervision; an aide to accompany J.S.K. to music class; parent counseling at a mental health facility; and a mainstreaming opportunity with Grade 1 students.
 
 
 17
 J.S.K.'s parents rejected the 1985 IEP, claiming that J.S.K. needed residential placement to achieve his necessary educational goals. J.S.K.'s parents requested a due process hearing pursuant to Fla.Stat. § 230.23, Florida's EAHCA counterpart. The hearing was held by the Florida Department of Administrative Hearings (DOAH), which ultimately rejected the 1985 IEP and ordered residential placement. The DOAH's decision was appealed by the Board to the Florida District Court of Appeal for the Second Circuit, which concluded that the 1985 IEP was appropriate under EAHCA, Fla.Stat. § 230.23, and the United States Supreme Court's criteria from Rowley, 102 S.Ct. at 3051 (developing two-part test to evaluate IEPs: "First, has the State complied with the procedures set forth in the [EAHCA]? And second, is the [IEP] ... reasonably calculated to enable the child to receive educational benefits?"). In November 1986 the Florida appellate court accordingly reversed the DOAH decision and remanded the case to the hearing officer to approve the plan unless other factors were developed at the rehearing to show the plan was inappropriate.
 
 The 1986 IEP
 
 18
 J.S.K.'s IEP for the 1986-87 school year was developed in May 1986. Like the 1985 IEP, the 1986 IEP placed J.S.K. in a LaBelle VE classroom, although with a different teacher. While the Board had access since 1984 to diagnoses indicating that J.S.K. was autistic, the 1986 IEP classified him as SED.
 
 
 19
 The 1986 IEP also classified J.S.K. as profoundly handicapped and identified his special needs: writing, reading, behavior, self care, social skills, study habits, gross motor training and language. The 1986 IEP included twenty-four hours per week of profoundly handicapped student programming and one hour per week of language impaired training. The IEP also included related services of individual counseling, parent counseling, special transportation services with an aide and a specially designed physical education class. The 1986 IEP provided three primary goals and objectives, under which there were many more particularized goals and objectives.
 
 
 20
 J.S.K.'s parents rejected the 1986 IEP and requested a due process hearing. In June 1987 the DOAH commenced a joint hearing to consider the remanded 1985 IEP and the recently rejected 1986 IEP. In separate orders, the hearing officer of the DOAH concluded that the 1985 IEP was appropriate and that the 1986 IEP passed the Rowley two-part test and provided J.S.K. with a "free appropriate public education"; the 1985 IEP remand order was issued in August 1987 and the 1986 IEP final order was issued in September 1987.
 
 
 21
 J.S.K.'s parents filed the current action in August 1988. Following extensive pretrial preparations and motions, the case was tried without a jury. At the close of J.S.K.'s case-in-chief, the Board moved for and was granted an involuntary dismissal of the 1985 IEP action; the trial judge concluded that he had to extend full faith and credit to the decision of the Florida District Court of Appeal for the Second Circuit and to the later DOAH rehearing that determined the 1985 IEP provided an appropriate education to J.S.K. The district court then entered judgment in favor of the Board on the 1986 IEP.
 
 
 22
 In its final order, the district court found and concluded among other things the following: that the district court had no jurisdiction over the 1986 IEP because J.S.K.'s parents had failed to file their action within thirty days of the DOAH's final ruling; that J.S.K.'s parents had preserved for appeal only the issue of residential placement because they had failed to exhaust their administrative remedies on all other issues; that under Rowley the 1986 IEP provided J.S.K. with a "free appropriate public education" from which he received educational benefits; that J.S.K.'s parents' request for relief was moot because J.S.K. was currently in residential placement funded by the HRS under Fla.Stat. § 393.051; and that the court had no authority to order a local school authority to implement a specific educational program or to retain jurisdiction to enforce such relief. This appeal followed.
 
 II. DISCUSSION
 A. Full Faith and Credit
 
 23
 The district court dismissed the 1985 IEP claim by J.S.K.'s parents because the court felt it had to extend full faith and credit to the Florida appellate court order and to the resulting DOAH final order that found the 1985 IEP was appropriate. We disagree.
 
 
 24
 The district court was right in holding that full faith and credit must be given to the Florida appellate court. The full-faith-and-credit statute declares that "[t]he records and judicial proceedings of any [state] court ... shall have the same full faith and credit in every Court within the United States...." 28 U.S.C. § 1738. Section 1738 required the district court to give the same preclusive effect to the Florida appellate court decision that the courts of the Florida would give to it. See, e.g., Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985). The district court, therefore, had to give preclusive effect to the Florida court of appeal decision that the 1985 IEP, as written, was appropriate; that, however, is all that the Florida court of appeal decided.
 
 
 25
 The district court erred in concluding that it must also grant full faith and credit to the resulting DOAH final order. The Florida appellate court remanded the case to the DOAH to determine whether the 1985 IEP, as applied, provided an appropriate education. The 1985 IEP was not found to be entirely appropriate until after the DOAH remand hearing, at which new evidence was admitted on J.S.K.'s experience during the 1985-86 school year. We agree with J.S.K.'s parents that, by dismissing the 1985 IEP claim, the district court was extending full faith and credit to the subsequent judicially unreviewed DOAH administrative hearing. This DOAH hearing was entitled to no full faith and credit because "[section] 1738 is inapplicable to judicially unreviewed findings of state administrative bodies." Astoria Fed'l Sav. & Loan Ass'n v. Solimino, --- U.S. ----, 111 S.Ct. 2166, 2170, 115 L.Ed.2d 96 (1991).
 
 
 26
 The proper question, then, is what effect, if any, the DOAH remand hearing had on the 1985 IEP claim of J.S.K.'s parents. Although section 1738 gives no preclusive effect to administrative hearings under EAHCA, courts can "fashion[ ] federal common-law rules of preclusion in the absence of a governing statute." University of Tennessee v. Elliott, 478 U.S. 788, 106 S.Ct. 3220, 3224, 92 L.Ed.2d 635 (1986) (citations omitted). Courts, though, have no
 
 
 27
 free rein to impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand. In this context, the question is not whether administrative estoppel is wise but whether it is intended by the legislature.
 
 
 28
 Solimino, 111 S.Ct. at 2169. We need then to examine section 1415 to determine whether Congress intended state administrative proceedings to have preclusive effect.
 
 
 29
 The Supreme Court's decisions in Elliott and Solimino guide us in this analysis. The Court in Elliott decided that Title VII administrative hearings have no preclusive effect but that 42 U.S.C. § 1983 administrative hearings have preclusive effect. In deciding that Title VII actions were entitled to no preclusive effect, the Court was persuaded by two factors. First, the Court noted that section 2000e-5(b) stated that the EEOC "must give 'substantial weight to final findings and orders made by State or local authorities,' " Elliott, 478 U.S. at 795, 106 S.Ct. at 3224, and concluded that "it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect." Id. Second, the Court noted that Title VII claimants are entitled to de novo review in federal courts and that "[i]t would be contrary ... to apply res judicata to deny [Title VII claimants] a trial de novo on ... Title VII claim[s]." Id. at 796, 106 S.Ct. at 3224-25.
 
 
 30
 In concluding, on the other hand, that section 1983 administrative hearings have preclusive effect, the Court in Elliott found that nothing in section 1983's language or legislative history expressed congressional intent to "repeal or restrict the traditional principles of estoppel." Id. at 797, 106 S.Ct. at 3225. The Court's conclusion to give preclusive effect to section 1983 state administrative hearings, though, was largely policy-based. The Court stated that "giving preclusive effect to administrative factfinding serves the value underlying general principles of collateral estoppel enforcing repose ... and also serves the values of federalism." Id. at 798, 106 S.Ct. at 3226 (footnotes and citations omitted).
 
 
 31
 The Court most recently addressed the question whether administrative hearings were entitled to preclusive effect in Solimino, where it held that judicially unreviewed administrative hearings under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-633a, had no preclusive effect. 111 S.Ct. at 2168. Relying heavily on Elliott, the Court first observed that, unlike the "substantial weight" review delimitation in section 2000e-5(b), ADEA contained no "express delimitation of the respect owed to state agency findings." Id. at 2171. The Court concluded, however, that there was nothing "talismanic" about the "substantial weight" provision and that ADEA "plainly assumes the possibility of federal consideration after state agencies have finished theirs." Id. (citing ADEA § 14(b), 29 U.S.C. § 633(b) (requiring exhaustion of state administrative relief); ADEA § 7(d)(2), 29 U.S.C. § 626(d)(2) (basing deadline for filing ADEA actions on termination of state administrative action)). Because "such federal proceedings would be strictly pro forma if state administrative agencies were given preclusive effect[,] ... [thereby] reduc[ing] to insignificance those cases in which federal consideration might be pursued," id., the Court held that ADEA state administrative hearings had no preclusive effect.
 
 
 32
 We now look at section 1415. Section 1415(e)(1) says that a state administrative decision is "final," but that any party may bring a separate civil action if aggrieved by this final decision. 20 U.S.C. § 1415(e)(1). Section 1415(e)(2) states that the grievant
 
 
 33
 shall have the right to bring a civil action ... in any State court of competent jurisdiction or in a [federal] district court.... In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of the party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
 
 
 34
 20 U.S.C. § 1415(e)(2). In examining section 1415 in the light of Elliott and Solimino, we conclude that EAHCA administrative hearings have no preclusive effect in the federal court system.
 
 
 35
 Section 1415, like section 2000e-5(b) of Title VII, labels administrative decisions as "final." Unlike section 2000e-5(b), however, section 1415(e)(2) gives no weight to the administrative decision; it merely states that the records of the administrative proceedings shall be admitted into evidence in a civil action. 20 U.S.C. § 1415(e)(2). The legislative history of EAHCA demonstrates that this lack of deference was intentional. The original bill proposed by the House of Representatives, H.R. 7217, stated:
 
 
 36
 The findings of fact of a State [administrative hearing] shall be conclusive in any court of the United States if supported by substantial evidence, except that the court involved, for good cause shown, may remand the case to the State [administrative agency] to take further evidence. Any new or modified finding of fact made by the State [administrative agency] shall be conclusive if supported by substantial evidence.
 
 
 37
 H.R.Rep. No. 332, 94th Cong., 1st Sess., at 56; see also id. at 33. The final bill from the Senate, S. 6, that was enacted, however, was significantly different. Section 1415, as enacted, was "substitute[d] [for the House bill] ... to clarify and strengthen the procedural safeguards." S.Conf.Rep. No. 455, 94th Cong., 1st Sess., 27, at 48, reprinted in 1975 U.S.Code Cong. & Admin.News 1425, 1480, 1501 (emphasis added). The enacted bill removed the provision for the conclusiveness of the state administrative hearings and entitled
 
 
 38
 any party aggrieved by the findings and decision rendered in the due process hearing or the State [administrative] review ... to bring a civil action ... [in which] the court shall receive the records of the due process hearing (and where appropriate the records of the review of such hearing), shall hear additional evidence at the request of any party, shall make an independent decision based on the preponderance of the evidence and shall grant all appropriate relief.
 
 
 39
 Id. at 50, reprinted in 1975 U.S.Code Cong. & Admin.News, at 1503; cf. 20 U.S.C. § 1415(e)(2) (see supra for text). That Congress deliberately removed deference to EAHCA administrative hearings demonstrates Congress' intention to give them no preclusive effect.
 
 
 40
 A section 1415(e)(2) action also "requires [reviewing] courts to exercise de novo review over state educational decisions and policies." Rowley, 458 U.S. at 205, 102 S.Ct. at 3050; see also id. at 218-19, 102 S.Ct. at 3056 (White, J. dissenting). Because of the Court's holding in Elliott, 478 U.S. at 796-97, 106 S.Ct. at 3225 (de novo review excludes preclusive effect of Title VII administrative hearings), we conclude that an EAHCA grievant would be denied de novo review on appeal if state administrative hearings had preclusive effect.
 
 
 41
 We conclude also that Congress' purpose in enacting EAHCA would be undermined if state administrative hearings had preclusive effect. As the Supreme Court stated in Rowley, EAHCA "provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures." 458 U.S. at 179, 102 S.Ct. at 3037. "Compliance [with EAHCA requirements] is assured ... by the provision for judicial review." Id. at 183, 102 S.Ct. at 3039. If administrative hearings were entitled to preclusive effect, one of the primary provisions for assuring compliance--namely, de novo judicial review--would be rendered ineffective. We hold, therefore, that judicially unreviewed state administrative EAHCA hearings have no preclusive effect in the federal court system.
 
 
 42
 The district court erred in holding that it was precluded from reviewing the 1985 IEP. The final order from the DOAH remand hearing is a judicially unreviewed order that entitles any aggrieved party to bring a civil action. Because the district court failed to review the 1985 IEP, we vacate its judgment on the 1985 IEP claim and we remand this issue with specific instructions: On remand, the district court will determine only whether the 1985 IEP, as applied during the 1985-86 school year, provided an appropriate education to J.S.K. and, if not, whether there is legal significance under EAHCA to such a failure. The appropriateness of the written 1985 IEP was conclusively determined by the Florida appellate court, which is entitled to full faith and credit.
 
 B. Thirty-day Statute of Limitations
 
 43
 The district court also held that it was jurisdictionally barred from deciding the 1986 IEP claim by Florida's thirty-day time limit on commencing appeals. See Fla.R.App.P. 9.110(b). We disagree.
 
 
 44
 We will assume without deciding that the district court properly borrowed the thirty-day limitation period from the Florida Appellate Procedure Act.[1] Even if the court properly borrowed the thirty-day period, however, this period would be only a statute of limitation, not a jurisdictional bar. The thirty-day period would be a jurisdictional bar only if J.S.K.'s parents were relying on state law for their cause of action. Cf., United States v. Broward County, 901 F.2d 1005, 1008-09 (11th Cir.1990) (in federal common-law cause of action in quasi-contract, district court erred in relying on state limitation period as jurisdictional bar). Here, the district court borrowed the thirty-day period because Congress failed to include a statute of limitations within the federal cause of action it created in section 1415(e)(2). So, the district court was borrowing only a statute of limitations.
 
 
 45
 We have said before that "raising of the statute of limitations is an affirmative defense." Blue Cross and Blue Shield of Alabama v. Weitz, 913 F.2d 1544, 1552 (11th Cir.1990) (citing Fed.R.Civ.P. 8(c)); cf. Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150, 1167 (3d Cir.1986) ("A statute of limitations time bar is not jurisdictional; rather, it constitutes an affirmative defense that is waived if the defendant fails to raise it in his answer."). The Board failed to assert in its original answer the statute-of-limitations affirmative defense. Also, when it tried later to amend its answer to include this affirmative defense, the district court denied the motion.[2] Because the Board never effectively raised the thirty-day statute-of-limitation affirmative defense and because the Board on appeal fails to address whether the district court erred in denying its motion to amend, the Board has waived this affirmative defense. J.S.K.'s parents were not time-barred from bringing their 1986 IEP claim.
 
 C. Exhaustion of Administrative Remedies
 
 46
 The district court concluded that J.S.K.'s parents failed to exhaust their administrative remedies and, so, had standing only to challenge the 1986 IEP on the issue of residential placement. We disagree. The DOAH's September 22, 1987 Final Order concerning the 1986 IEP indicates that the DOAH reviewed the entire 1986 IEP, not merely the residential placement issue. In the final order, the hearing officer made many determinations of fact and law demonstrating that all factors regarding the appropriateness of the 1986 IEP were examined and evaluated. J.S.K.'s parents therefore exhausted their administrative remedies in the state administrative hearing and had standing to challenge the entire 1986 IEP at the district court's de novo trial.
 
 D. The Rowley Standard
 
 47
 In reviewing the district court's findings, we agree with other circuit courts that the question whether an IEP provided a "free appropriate public education" that educationally benefitted the handicapped child is a mixed question of fact and law subject to de novo review. See, e.g., Lachman v. Illinois State Board of Educ., 852 F.2d 290, 293 (7th Cir.1988); Gregory K. v. Longview School Dist., 811 F.2d 1307 (9th Cir.1987). The district court, in addressing the material grievance of J.S.K.'s parents, held that the 1986 IEP met the Supreme Court's Rowley standard. We agree. In Rowley, the Supreme Court established a two-part test to determine the appropriateness of an IEP:
 
 
 48
 First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through that Act's procedure reasonably calculated to enable the child to receive educational benefits?
 
 
 49
 Rowley, 458 U.S. at 206-07, 102 S.Ct. at 3051. Because the Board has satisfied the procedural and educational-benefit requirements of EAHCA, the 1986 IEP meets the Rowley standard.
 
 Procedural Requirement
 
 50
 Despite an attempt at trial to argue that Peggy Tucker's (J.S.K.'s 1986-87 teacher) day-to-day activities that were not expressly included in the 1986 IEP violated EAHCA procedural guidelines, J.S.K.'s parents admitted through their attorney that this was a "makeweight" argument and not a "linchpin" of their case. J.S.K.'s parents also recognize on appeal that the essential dispute in this case is whether J.S.K.'s IEP was appropriate. We agree and conclude that Tucker's classroom activities violated no EAHCA procedural requirements.
 
 
 51
 Our inquiry does not stop here, however. The Supreme Court has stated that the procedural inquiry must also determine whether the "State has created an IEP for the child ... which conforms with the requirements of § 1401(a)( ." Rowley, 458 U.S. at 206 n. 27, 102 S.Ct. at 3051 n. 27. After reviewing the record, we conclude that the 1986 IEP satisfies section 1401(a)(20) requirements.[3]
 
 
 52
 Section 1401(a)(20) says that the IEP shall include a statement of present educational levels, 20 U.S.C. § 1401(a)(20)(A); a statement of annual goals, id. § 1401(a)(20)(B); a statement of educational services to be provided and the extent to which the child will participate in regular educational programs, id. § 1401(a)(20)(C); the initiation date and duration of these services, id. § 1401(a)(20)(E); and appropriate objective criteria for determining whether instructional objectives are being met, id. § 1401(a)(20)(F). In summarizing the alleged insufficiencies in the 1986 IEP, J.S.K.'s expert witness, Amy Wetherby, testified that the goals and objectives were too "vague," that communication and social-interaction goals were insufficient and that there was no adequate plan for integration with nonhandicapped children or for a behavioral program. Because these criticisms do not expressly or impliedly allege that the 1986 IEP procedurally violated section 1401(a)(20) and because nowhere else on appeal do J.S.K.'s parents argue that the 1986 IEP procedurally violated section 1401(a)(20), we conclude after reviewing the record that the 1986 IEP satisfies EAHCA procedural requirements.
 
 Educational-Benefit Requirement
 
 53
 J.S.K.'s parents argue that, to satisfy the second part of Rowley, the Board must have provided J.S.K. with what his parents call "meaningful" educational benefits. We are not sure what "meaningful" is intended to signify; but as we understand J.S.K.'s parents, we disagree with this characterization.
 
 
 54
 J.S.K.'s parents note on appeal that in Rowley the Court stated that, "in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." Rowley, 458 U.S. at 192, 102 S.Ct. at 3043 (emphasis added). "Meaningful" only modified "access." More important, the Court further stated that "the intent of the [EAHCA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Id.
 
 
 55
 The Court, however, recognized that EAHCA would be worthless if handicapped children received no benefit from the "free appropriate public education." As the Court stated: "Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." Id. at 200, 102 S.Ct. at 3048 (emphasis added). Perhaps realizing that there could be no universal measure of "some educational benefit," the Court confined itself to a case-specific analysis of the handicapped child and did "not attempt ... to establish any one test for determining the adequacy of educational benefits conferred upon all children by the [EAHCA]." Id. at 202, 102 S.Ct. at 3049. The Court, in holding that the child's education was adequate, though, found that the educational benefit need not achieve the handicapped child's "maximum potential," id. at 198, 204 n. 26, 102 S.Ct. at 3046, 3049 n. 26, or that the educational benefit be more than adequate. As long as the handicapped child received "personalized instruction with sufficient support services to permit the child to benefit educationally," id. at 203, 102 S.Ct. at 3049, EAHCA educational-benefit requirements would be satisfied.
 
 
 56
 J.S.K.'s parents and the Board acknowledge that in Drew P. v. Clarke County School Dist., 877 F.2d 927 (11th Cir.1989), we addressed the issue of the level of educational benefit required under EAHCA. J.S.K.'s parents contend that Drew P. stands for the proposition that a child must receive a "meaningful" educational benefit. We disagree to the extent that "meaningful" means anything more than "some" or "adequate" educational benefit. In Drew P. we held that "[t]he state must provide a child only with a 'basic floor of opportunity.' " Id. at 930 (quoting Rowley, 102 S.Ct. at 3048). Our decision in Drew P. was not based on whether Drew P. was receiving "meaningful" educational benefits, but was based on whether he was receiving any educational benefits. Id. at 931 (stating that "residential placement was necessary ... to receive any educational benefit").
 
 
 57
 Following Rowley, we hold today that the state must provide to the handicapped child personalized instruction and services that meet state educational standards and that comport with the child's IEP, which must be formulated according to EAHCA requirements. Rowley, 458 U.S. at 203, 102 S.Ct. at 3049. We also stress that, when measuring whether a handicapped child has received educational benefits from an IEP and related instructions and services, courts must only determine whether the child has received the basic floor of opportunity. Todd D. v. Andrews, 933 F.2d 1576, 1580 (11th Cir.1991). This opportunity provides significant value to the handicapped child who, before EAHCA, might otherwise have been excluded from any educational opportunity. The IEP and the IEP's educational outcome need not maximize the child's education. Id.; Doe v. Alabama State Dep't of Educ., 915 F.2d at 665. If the educational benefits are adequate based on surrounding and supporting facts, EAHCA requirements have been satisfied. While a trifle might not represent "adequate" benefits, see, e.g., Doe v. Alabama State Dep't of Educ., 915 F.2d at 665, maximum improvement is never required. Adequacy must be determined on a case-by-case basis in the light of the child's individual needs.[4]
 
 
 58
 In applying this standard to J.S.K.'s education, we conclude that he received adequate educational benefit. We acknowledge at the outset that courts "lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' " Rowley, 458 U.S. at 208, 102 S.Ct. at 3052. "Courts must be careful to avoid imposing their view of preferable educational methods on the States." Id. at 207, 102 S.Ct. at 3051 (footnote omitted). We stress that "it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to § 1415(e)(2)." Todd D., 933 F.2d at 1581 (citing Rowley, 102 S.Ct. at 3051), and that great deference must be paid to the educators who developed the IEP. Id. Guided by these principles, we conclude that the 1986 IEP provided J.S.K. with adequate educational benefits.
 
 
 59
 The Board presented evidence at trial demonstrating that J.S.K. received adequate educational benefits during the 1986-87 school year. Also, J.S.K.'s parents' key expert/consultant, Amy Wetherby, suggested that J.S.K. received adequate educational benefits. For example, on page four of Wetherby's May 21, 1987 Consultant Report she wrote:
 
 
 60
 [J.S.K.] has made substantial progress in preacademics and behavior management during the school year 1986/87.... The progress that [J.S.K.] has made during 1986/87 indicates that [J.S.K.] can learn new skills given an adequate educational program.
 
 
 61
 Later, on page six, when discussing her general impressions of J.S.K.'s educational programs, she wrote that, during the 1986-87 school year, J.S.K.'s teacher had "clearly demonstrated that [J.S.K.] can progress on a large number of goals and manage his behavior when provided with a good educational and behavioral program." Aside from testifying that J.S.K. did not need residential placement to benefit educationally during the 1986-87 school year, Wetherby testified:
 
 
 62
 If you define [appropriate education] as that the child is making measurable gains within the classroom, then I would say that '86-'87 was meeting that standard, but if you define it as the child is making meaningful gains and that the child is able to demonstrate those across settings, which is particularly critical for autistic children, then I would say no.
 
 
 63
 We in fact do define "appropriate education" as making measurable and adequate gains in the classroom. If "meaningful gains" across settings means more than making measurable and adequate gains in the classroom, they are not required by EAHCA or Rowley.
 
 
 64
 We do not suggest that Wetherby never attacked the level of J.S.K.'s educational benefits--as the earlier quotation indicates, she felt that his gains were inadequate because they were not "generalized" or "demonstrate[d] ... across settings." Her criticism, however, indicated that she felt J.S.K.'s educational benefits under EAHCA should be maximized. We disagree. The Supreme Court has stated: "Whatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education." Rowley, 458 U.S. at 197 n. 21, 102 S.Ct. at 3046 n. 21. Because J.S.K. received adequate educational benefits from the 1986 IEP during the 1986-87 school year, the Board has satisfied the second part of Rowley.
 
 
 65
 E. Mootness, Relief and Retention of Jurisdiction
 
 
 66
 Because we vacate and remand J.S.K.'s parent's 1985 IEP claim and because we find that the 1986 IEP satisfies the requirements of EAHCA and Rowley, J.S.K. and his parents are entitled to no relief at this time. Therefore, we need not reach the questions whether J.S.K.'s parents' request for particular forms of relief was mooted by J.S.K.'s residential placement or whether the district court had authority to order compensatory relief and to retain jurisdiction to enforce any relief that might be granted.
 
 III. CONCLUSION
 
 67
 Because we conclude that the district court incorrectly gave preclusive effect to a state administrative EAHCA hearing, we VACATE the 1985 IEP judgment and REMAND the 1985 IEP claim to the district court to determine if the 1985 IEP, as applied during the 1985-86 school year, provided an appropriate education to J.S.K. We AFFIRM the district court's judgment that the 1986 IEP satisfied EAHCA.
 
 
 
 *
 Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 The Supreme Court has held that "when Congress has failed to provide a statute of limitations for a federal cause of action, a court 'borrows' or 'absorbs' the local time limitation most analogous to the case at hand." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, --- U.S. ----, 111 S.Ct. 2773, 2778, 115 L.Ed.2d 321 (1991) (citations omitted). When Congress enacted and later amended EAHCA, it provided no statute of limitations for the section 1415(e)(2) civil action. The Board argued that the most analogous time limitation from Florida law is the 30-day time limitation on commencing appeals in the Florida Appellate Procedure Act. See Fla.R.App.P. 9.110(b). While we need not decide the issue--even if we were to adopt the 30-day statute of limitations, the Board waived this affirmative defense--we are persuaded considerably by Department of Education of Hawaii v. Carl D., 695 F.2d 1154 (9th Cir.1983). The Ninth Circuit in Carl D. "borrowed" the Hawaii Administrative Procedure Act 30-day limitation period for EAHCA causes of action brought under section 1415(e)(2). We are influenced particularly by the Ninth Circuit's recognition that a 30-day statute of limitation "assure[s] prompt resolution of disputes over [IEPs] for handicapped children." Id. at 1157
 
 
 [2]
 Despite the lack of proper affirmative pleading, the district court, of course, did consider lack of timeliness as a basis for dismissal for lack of subject-matter jurisdiction. But, we see nothing in the record to indicate that the district court ever moved from its expressed view that, if timeliness were not jurisdictional, the Board's statute-of-limitation argument was presented too late and would not be allowed
 
 
 [3]
 In addition to the special needs and related services identified earlier, the 1986 IEP also provided the following primary and subsidiary goals and objectives: First, the IEP sought to improve basic language skills, including answering "who" and "what" questions, responding to "if-then" statements, providing logical explanations and using the pronoun "I." Second, the 1986 IEP sought to improve behavior and work habits, including reducing self-abuse, reducing cursing, increasing time on tasks, developing parallel play skills and following complex verbal directions. Third, the 1986 IEP sought to improve academic skills, including correctly sequencing events, identifying initial consonants, matching colors and words, identifying survival sight words, answering questions about a story, discriminating among different objects, copying numbers and letters, identifying before and after, differentiating long, short and tall, cutting on a curved line, coloring within lines, lacing and tying shoes and recognizing and naming a penny and dime. The 1986 IEP also suggested an individual aide in the classroom, daily speech therapy and summer school
 
 
 [4]
 We note that J.S.K.'s parents, the Board and the district court have tried to analogize J.S.K.'s situation to other plaintiff handicapped children. We find the comparisons unhelpful. To be of value, a court's analysis must focus on the facts of the case before it when examining an IEP. That one child in another case might be more or less handicapped can be at best speculation and of little help in determining whether a personalized IEP has provided adequate educational benefit. As the Supreme Court noted in Rowley, 458 U.S. at 202, 102 S.Ct. at 3048-49, personalized instructions and services that educationally benefit one child might or might not provide adequate educational benefits to another child. The facts of the case must guide the decision